UNITED STATES of America

v.

Arthur L. PIMENTAL, Defendant.

Crim. No. 99–10310–NG.

United States District Court,
D. Massachusetts.

Dec. 19, 2002.

Harvey R. Peters, Peters & Moscardelli, Boston, MA, James Rehnquist, Goodwin Procter, LLP, Boston, MA, for Defendants.

Mark J. Balthazard, U.S. Attorney's Office, Boston, MA, for Plaintiff.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

This case arises from one of several prosecutions brought in this district by the United States Attorney's Office at the behest of the Insurance Fraud Board of Massachusetts ("IFB"), a state-chartered but privately maintained organization created to investigate and police insurance fraud.

In this instance the IFB and U.S. Attorneys have focused on husband and wife Arthur and Loretta Pimental, who own and maintain a small, some might say a "mom-and-pop" construction business, for mail fraud. The indictment alleges that the Pimentals conspired to and did make use of the mails to misrepresent the nature of their construction work, and its amount of payroll, in order to obtain lower premiums for workers' compensation insurance. The IFB investigation that culminated in these charges was substantially assisted by the local ironworkers' union, which arranged and housed meetings between IFB investigators and former employees of Pimental who had since joined the union. Indeed, there is some suggestion in the evidence that the union facilitated the investigation in retaliation for the fact that Pimental ran a nonunion shop.

Significantly, the Pimentals were charged with a federal crime, even though remedies for conduct of this nature are amply available in the state courts—including civil remedies. Somehow the IFB, an organization representing private insurers acting under the aegis of the state, has enlisted United States Attorneys to address issues through the criminal law that they could well resolve themselves through less drastic means and with private funds. In fact, the IFB, by making case referrals to the Federal Bureau of Investigation, even selects the exemplar defendants.

Moreover, the selection of a federal forum seems particularly inappropriate here. The workers' compensation system is an instrument of state law subject to the administration of state agencies.

A jury trial was held in September 2000, and the jury rejected outright the indictment's allegation of conspiracy against both defendants, all eleven of its counts of mail fraud against Loretta Pimental, and nine of the eleven counts brought against her husband. The remaining two mail fraud counts centered on mailings from an independent loss control inspector to the Pimentals' insurers. These mailings, however, had nothing to do with the determination of premiums and played no role in perpetuating the charged scheme to defraud.

Accordingly, Arthur Pimental moves under Rule 29 for entry of acquittal on both counts, notwithstanding the verdict. Pimental's Rule 29 motion is **GRANTED**, due to the government's failure to establish the jurisdictional requirement of "use of the mails" on the counts convicted. Pimental also moves to dismiss based on the court's earlier finding that the government's sharing of secret grand jury materials violated Federal Rule of Criminal Procedure 6(e). *United States v. Pimental,* 199 F.R.D. 28, 31 (D.Mass.2001) (*"Pimental I"*). I later found the violation to be harmless error, *United States v. Pimental,* 204 F.R.D. 223, 228 (D.Mass.2001) (*"Pimental III"*), but based on evidence at trial that for the first time reveals the full effect of the violation on the grand jury proceedings, the Pimentals renew their motion to dismiss the indictment outright. For the reasons set forth below, Pimental's Rule 6(e) motion is **MOOT**.

## I. FACTS/PROCEDURAL HISTORY

### A. The Indictment

During the period of time covered in the indictment, *i.e.,* April 1993 to April 1999,

Arthur Pimental owned and operated a small construction outfit, variously named Pimental Steel Erectors, A. Pimental Steel Erectors, Inc., and A.P.S. Products, Inc. The company employed a handful of non-union ironworkers on a seasonal basis and erected steel structures, mostly one- or two-story buildings. The erection process entailed the placement of girders, columns, and joints to support the structure, then laying corrugated-metal "decking"—the ceiling and floors of the building—and welding it into place. Though there was some suggestion in the openings that Pimental's business originally did foundation work, which involved steel-reinforced concrete, the evidence is uncontested that during the charged period, Pimental's company did not do this type of work.

To obtain workers' compensation insurance, as state law requires, *see* Mass. Gen. Laws c. 152, § 25A, Pimental had to provide his insurance companies, Hartford Fire Insurance Companies, Wausau, A Mutual Company, and, Savers Property & Casualty Insurance Company, with information relating to the type of work performed by his employees and the amount of pay they earned in a given period. Specifically, Pimental was required to enter a four-digit "job classification code" into forms that he would submit to his insurers. The state Workers' Compensation Rating and Inspection Bureau delineates job classifications and designates insurance rates for each classification based on the risk of injury associated with that trade. For example, the insurance rate for steel erection in 1993 was $99.35 per hundred dollars in payroll for buildings over two stories in height, and $69.22 for smaller structures. Foundation work involving steel-reinforced concrete, classified as "concrete construction," was less dangerous and thus, less expensive to insure. The rate for that work was $41.22, and for decking $19.82 or $24.66, depending upon

the weight of the materials. These rates fluctuated from year to year, but the rates for welding and decking were consistently less than half the rate of concrete foundation work in a given year, which was in turn consistently less than half the rate for steel erection.

Where, as in Pimental's case, employees perform a range of tasks that fall under different classifications, an employer may list more than one classification code and parse out the tasks accordingly. In fact, in May 1999, six months before the government issued its indictment, the state Workers' Compensation Rating and Inspection Bureau issued a report describing Pimental's entitlement to do just that. The Bureau report described its review of Pimental's operations and informed Pimental of the appropriate job classifications for the various tasks his workers performed at construction sites.

The Bureau concluded that welding of steel decking inside buildings, miscellaneous welding, installation of sheet metal to building exteriors, installation of concrete foundations, and erection of steel frames all fell under different classification codes, with different insurance rates. The Bureau stated that, under the state workers' compensation regime, Pimental was entitled to allocate payroll among the various job classifications as appropriate. Though it is clear that Pimental's classification of his company's work as "concrete construction" was inaccurate, the fact that he did *some* steel erection work did not mean he was obligated to insure his entire operation under this category.

On September 29, 1999, a federal grand jury indicted the Pimentals on one count of conspiracy, in violation of 18 U.S.C. § 371, and fourteen counts of mail fraud, in violation of 18 U.S.C. § 1341. The indictment alleged that, where a portion of Pimental's work involved steel erection, he falsely

characterized his work entirely as "concrete construction," so that he could take advantage of a lower insurance rate and pay lower premiums. The indictment did not address Pimental's entitlement to break down his operations into different tasks and insure them at different rates; thus, it did not take account of the fact that the insurance rate for concrete construction was in fact much higher than the rates for welding and decking, which represented significant components of Pimental's operations. The government also charged that Pimental understated the amount of his payroll to insurers.

The indictment was the culmination of a joint investigation conducted by the Federal Bureau of Investigation and the Insurance Fraud Bureau of Massachusetts ("IFB"). The IFB is, in the government's words, "a state-chartered, privately funded investigative entity, established by the Automobile Insurance Bureau of Massachusetts and the Workers' Compensation Bureau of Massachusetts pursuant to a grant of authority from the Massachusetts Legislature." The IFB's statutory charter assigns it the role of "prevention and investigation of fraudulent insurance transactions." Mass. St.1996, ch. 427, § 13. The IFB is a hybrid of public and private interests. Though fully funded by private insurance companies, the board of fifteen members that oversees the activity of the IFB includes five public officials.[1] *Id.* The IFB did the preliminary inquiry into the Pimentals' practices and referred the case to the United States Attorney's Office ("USAO") for prosecution.

### B. The Rule 6(e) Violation

The relationship between prosecutors and the IFB is a cozy one. It has become the practice of the USAO to move *ex parte* under Rule 6(e) of the Federal Rules of Criminal Procedure for disclosure of grand jury materials to the IFB. The Rule authorizes disclosure to "any government personnel—including those of a state ...— that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law." Fed.R.Crim.P. 6(e)(3)(A)(ii). Courts have summarily granted these motions, and the emergency judge in this case did the same.

The Pimentals challenged the delivery of grand jury materials to the IFB, and in a February 20, 2001, opinion, I held that the IFB was not "government personnel" for the purposes of the rule and awarded the Pimentals discovery on the "scope and possible impact" of the Rule 6(e) violation. *Pimental I,* 199 F.R.D. at 33–35. Due to issues raised in the oral argument of this motion, on April 11, 2001 I stayed discovery on the Rule 6(e) issue and ordered supplemental briefing on two questions: (1) whether discovery could be ordered absent a showing of a "knowing" or bad-faith violation of Rule 6(e), and (2) whether the government actually acted in bad faith or with knowledge of a discovery violation in this case. *United States v. Pimental,* 201 F.R.D. 24, 27 (D.Mass.2001). In a June 4, 2001 decision, I held that, given the difficulty of the legal issues and conflicting precedent, the government's violation of Rule 6(e) was not "knowing." *See Pimental III,* 204 F.R.D. at 224. Nonetheless, I was also satisfied that a showing of a "knowing" violation or Rule 6(e) was not required in order to grant the Pimentals the discovery they requested. *See id.*

[1]. The remaining ten members of the IFB's governing board come from the governing committees of two organizations of Massachusetts insurers—the Automobile Insurance Bureau of Massachusetts and the Workers' Compensation Rating and Inspection Bureau of Massachusetts.

After reviewing the discovery granted to them, the Pimentals moved under Rule 6(e) for dismissal of the indictment. They argued that the government's disclosure of bank records to IFB investigator Scott Faragi substantially influenced the grand jury's decision to indict. Faragi testified before the grand jury as an expert on the insurance industry; he also prepared and explained summaries of the Pimentals' bank records. In a December 3, 2001 decision, I applied the harmless error standard, *see* Section II.B, *infra,* and held that Faragi's summation of the bank records was not crucial to the grand jury's decision to indict. *Id.* at 227–28. The records were available to the grand jury in any case, and Faragi's assistance in digesting them—though improperly obtained—did not warrant dismissal of the indictment under Rule 6(e).[2] *Id.*

### C. *The Trial*

The government voluntarily dismissed three of the mail fraud counts on September 16, 2002, and the case proceeded to a jury with twelve counts remaining against both defendants: a single charge of conspiracy to commit mail fraud, and eleven counts of mail fraud. The jury acquitted Loretta Pimental of all charges and convicted Arthur Pimental of Counts 2 and 4 of the revised indictment. Arthur Pimental moves under Rule 29 of the Federal Rules of Criminal Procedure for acquittal on the mail fraud counts, on grounds that the jury verdict was based on insufficient evidence of both a scheme to defraud and use of the mails. The defendants also renew their motion to dismiss the indictment under Rule 6(e), arguing that new evidence adduced at trial suggests that

Faragi's role before the grand jury was indeed prejudicial and not harmless error.

## II. *DISCUSSION*

### A. *The Rule 29 Motion*

Rule 29(c) of the Federal Rules of Criminal Procedure permits a defendant to move for a judgment of acquittal after the entry of a guilty verdict. Fed.R.Crim.P. 29(c). Where, as here, the defendant challenges the sufficiency of the prosecution's evidence, it is appropriate to view the evidence and draw all inferences in the light most favorable to the verdict. *United States v. McGauley,* 279 F.3d 62, 66–67 (1st Cir.2002); *United States v. Benjamin,* 252 F.3d 1, 5 (1st Cir.2001).

A mail fraud conviction requires proof beyond a reasonable doubt of "(1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails ... in furtherance of the scheme." *McGauley,* 279 F.3d at 67 (quoting *United States v. Woodward,* 149 F.3d 46, 54 (1st Cir.1998)) (alterations in original).

### 1. *Scheme to Defraud*

Federal courts have traditionally read the statutory term "defraud" to mean "wronging one in his property rights by dishonest methods or schemes" or to entail "the deprivation of something of value by trick, deceit, chicane, or overreaching." *McNally v. United States,* 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (quoting *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924)) (internal quotation marks omitted). The case law has performed further exegesis on what "deprive"

---

**2.** The Pimentals moved to dismiss the indictment a second time mid-trial, on September 30, 2002, and I again denied the motion.

means, with the result that Pimental and the government here dispute whether mail fraud can be a "victimless" crime. As I will explain more fully below, Pimental takes the view that the scheme alleged by the government, though Pimental may (or may not) have gained from it, does not qualify as a scheme to defraud because Pimental's insurers—who never had to pay out a claim—were never deprived of anything.

The government reads the case law to support liability under the mail fraud statute where the scheme is intended *either* to confer an unjust benefit on the defendant *or* to deprive another of a property right. *See United States v. Czubinski*, 106 F.3d 1069, 1074 (1st Cir.1997) ("Binding precedents, and good sense, support the conclusion that to 'deprive' a person of their intangible property interest in confidential information under section 1343, either some articulable harm must befall the holder of the information as a result of the defendant's activities, or some gainful use must be intended by the person accessing the information, whether or not this use is profitable in the economic sense."), *quoted in United States v. Jordan*, 112 F.3d 14, 19 (1st Cir.1997).[3]

Pimental takes a stricter—and certainly more literal—view of the term "deprive" to require a showing of harm to the victim. Pimental cites *United States v. Sawyer*, 85 F.3d 713, 724 (1st Cir.1996), *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994), and *United States v. Starr*, 816 F.2d 94, 98 (2d Cir.1987), for this proposition. In *Sawyer*, the court characterized the

usual scenario where the allegation is that the bribery of a public official deprives the public of honest services. The court observed that honest services cases "typically involve either bribery of the official or her failure to disclose a conflict of interest, resulting in personal gain." *Sawyer*, 85 F.3d at 724. It was essentially a zero-sum game: a public official cannot take a bribe and not, as a legal matter, "deprive" the public of honest services in the process.[4] *Sawyer*'s holding certainly did not stand for the principle that in cases not involving "honest services," the defendant's accrual of a benefit to himself, absent a showing of some loss to another, precludes a finding of a scheme to defraud.

■ In any case, I find the same zero-sum game as found in *Sawyer* to exist here. The charged scheme to defraud is that Pimental made misrepresentations to his insurers toward the end of paying lower insurance premiums than were actually due. The result of this scheme, if it succeeded, would be that Pimental accrued a benefit, lower premiums, and the insurers necessarily suffered a loss, that is, a gap between its actual risk exposure and the premiums it received, which were calculated to correspond to a lower risk exposure. The question whether the government may prove mail fraud with a mere showing of benefit accrued to the defendant—and no showing of intended harm to victims—is therefore not material to this case.

■ Pimental further challenges the claim that he got a benefit at all. Pimen-

3. *Czubinski*, it is important to note, did not turn on this issue. The First Circuit held that the defendant, who accessed an IRS database without authorization, was not liable for wire fraud, as the government made no showing that Czubinski intended either harm to the IRS or any benefit to himself. *Czubinski*, 106 F.3d at 1077.

4. The out-of-circuit cases are less ambiguous. Although the schemes in *D'Amato* and *Starr* both benefited the defendants and harmed their victims, *Starr*, for its part, asserts that "[o]nly a showing of intended harm will satisfy the requirement of fraudulent intent." *Starr*, 816 F.2d at 98 (emphasis added).

tal paid the insurance premiums due for concrete construction. There is no evidence to suggest that he obtained coverage for any work activities other than the concrete foundation work. In sum, Pimental argues that he "got what he paid for," that is, he purchased workers' compensation insurance for concrete rebar work, but no coverage was necessarily extended for the workers on his steel erection and other projects—which the evidence suggested comprised all of his business. His business was therefore under-insured, perhaps in violation of Chapter 175A, the state workers' compensation statute, but he did not commit federal mail fraud, because under Chapter 175 of the Massachusetts General Laws, an insurance policy is voidable upon a showing that a policyholder's misrepresentation was material to its issuance. Mass. Gen. Laws. c. 175, § 186.

■ But Pimental misperceives the law. Under workers' compensation law—as opposed to insurance generally—Pimental's insurers could not refuse coverage for an on-the-job accident. Workers' compensation law works differently in this respect. As the government rightly observes, under state workers' compensation law, an insurer must provide coverage to an insured's employees regardless of whether the workplace risk was accurately reflected in the employer's premium payments. *See Employers Mut. Liability Ins. Co. of Wisconsin v. Merrimac Mills Co.*, 325 Mass. 676, 681, 92 N.E.2d 256 (1950) (finding the plaintiff insurance company entitled to additional workers' compensation premiums to account for activities the employer failed to acknowledge to the insurer in earlier declarations, because the plaintiff would have been required to extend coverage for injuries in those activities); *Phalen's Case*, 271 Mass. 371, 373–34, 171 N.E. 438 (1930) ("If the claimant was covered by the policy, it was not material whether the insur-

er, had it known of the operation of the gravel pit, would have charged a higher premium or assigned a different classification in the policy."). That is, the insurer is bound to extend coverage to all injuries sustained on the job, and not only to those sustained by workers discharging tasks within the scope of the job classification code the employer has selected.

Pimental notes further that even if I were to require a finding of loss to the victim, there is no such loss here or intended loss. Heightened risk, he claims, is not enough. *See United States v. Tobin*, 28 F.Supp.2d 674, 677 (D.Mass.1998). The defendant in *Tobin* was convicted of mail fraud for understating payroll amounts to his workers' compensation insurer, thereby obtaining reduced premiums. *Tobin*, 28 F.Supp.2d at 675–76. In its assessment of restitution costs, the *Tobin* court refused to treat as "actual loss" the gap between the premiums Tobin owed and what he actually paid; it held instead that the proper amount of restitution was the measure of "the amount of the claims paid under the policy." *Id.* at 677.

■ Because Pimental made no claim on the policies in this case, he argues that *Tobin* warrants a finding that there was no actual or intended loss to the insurer, and therefore no scheme to defraud. However, "actual loss" for restitution purposes and the requirements of a scheme to defraud are two different things. The *Tobin* court did not accept the gap in premiums as a viable restitution amount because the value of the policy was too difficult to quantify. *See id.* ("The Court concludes that the 'value' of the insurance coverage is too abstract and uncertain under the circumstances of this case to constitute lost property for purposes of calculating restitution under section 3663 or 3663A."). Mail fraud liability, which is routinely predicated on a "deprivation of honest ser-

vices" theory, *see, e.g., United States v. Sawyer,* 85 F.3d 713 (1st Cir.1996), does not require that the harm be quantifiable.

Even if the policies were voidable under the law, it does not follow of necessity that there was no improper gain to Pimental or harm to the insurer. The fact that the policies were voidable suggests that there was a harm, but it was redressable in a civil suit. In any event, nothing in the mail fraud statute suggests that it was meant to exclude all schemes that intend harms otherwise redressable.

Indeed, while it may well be that this case was more appropriately brought in a state civil court by the insurer, *see Tobin,* 28 F.Supp.2d at 677 n. 4 (rejecting the prosecution's premium-based restitution theory, suggesting that the insurer file in state court to recover expectation damages, and noting that "Congress did not intend that the government's limited prosecutorial resources be marshaled to secure the benefit of the bargain to insurance companies"); *Employers Mutual,* 325 Mass. at 681, 92 N.E.2d 256 (providing a remedy for private insurers when employer declarations understate their risk), that cannot frame the issues under Rule 29. The government, after all, secured a mail fraud conviction in the *Tobin* case on a similar theory. In *Tobin,* admittedly, the insurers paid Tobin on a claim. But as the government needs to show a *scheme* to defraud—and not actual defrauding—the distinction is not material. There is evidence to support the jury's conviction that Pimental would have sought coverage for an employee's injury while performing steel erection work, even though the premiums he paid covered the less dangerous category.

Pimental also argues—and correctly—that the insurers were not necessarily entitled to higher premium payments than he actually made. It is clear from the evidence that Pimental's employees performed various tasks; the Workers' Compensation Rating and Inspection Bureau issued a report affirming this. Pimental repeatedly assigned an across-the-board "concrete construction" classification code to his business. He did not allocate his employees' various tasks among different classification codes, as he was entitled to do under the law. Though the insurance rate for some of the work—the erection of steel frames—was over twice as high as it was for "concrete construction," other tasks, like decking, welding, and sheet-metal work, were much cheaper to insure. Depending on the number of hours his employees spent on each task—and the government offered no evidence on this point—Pimental might well have paid *higher* premiums than were required of him.

But again, the required proof is of an *intent* to defraud. There was sufficient evidence before the jury to permit an inference that Pimental made misrepresentations about the nature of his work with the intent to pay less than he owed to the insurance company. The scheme may have failed in its execution—it is possible that Pimental paid higher premiums than he should have, had he broken down his business by task. The insurers may not have lost a cent as a result of Pimental's misrepresentation of his work as "concrete construction." But the scheme to defraud need not have been successful in depriving the victim of property or securing a benefit to the schemer, *see Neder v. United States,* 527 U.S. 1, 24–25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1997); Pimental needs only to have intended that consequence.

The scheme to defraud that the government alleged—and the jury found—revolves around Pimental's alleged intention that his insurers bear greater risk at lower premium rates. Whether or not the insur-

ers actually had to pay a claim or were paid a penny less in premiums than they were entitled to have, I cannot find that there was insufficient evidence before the jury to support its conclusion that Pimental harbored that intent.[5]

### 2. *Use of the Mails*

Substantially more compelling is Pimental's challenge to the mailing elements of his convictions. The mail fraud statute "does not purport to reach all frauds, but only those limited instances in which the use of the mails is part of the execution of the fraud." *Kann v. United States*, 323 U.S. 88, 95, 65 S.Ct. 148, 89 L.Ed. 88 (1944). Accordingly, the government must show beyond a reasonable doubt that Pimental caused the mailings listed in the indictment to be sent and that the mailings were in furtherance of the fraud.

■ To establish causation, a defendant need not make the mailing himself—it is sufficient that the mailing was a consequence known or reasonably foreseeable to him. *United States v. Serafino*, 281 F.3d 327, 333 (1st Cir.2002). The "in-furtherance" component has a bit more bite. Although "use of the mails need not be an essential element of the scheme," it is the prosecutor's task to show that the "mailing is part of the execution of the scheme as conceived by the perpetrator at the time." *Schmuck v. United States*, 489 U.S. 705, 710–11, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). The First Circuit's gloss on the in-furtherance element requires that " 'the scheme's completion or the preven-

tion of its detection *must have depended* in some way on the mailing.' " *United States v. Pacheco–Ortiz*, 889 F.2d 301, 305 (1st Cir.1989) (quoting *United States v. Pietri Giraldi*, 864 F.2d 222, 224 (1st Cir.1988)) (emphasis added).

Pimental suggests that neither of the mailings for which he was charged and convicted were in furtherance of the scheme as charged or reasonably foreseeable to him at the time they were sent. I will examine each mailing in turn.

### a. *Count 2: The October 5, 1994 "Account Data Report"*

The mailing described in Count 2 of the indictment is an "Account Data Report," prepared and dated October 5, 1994, detailing the findings of Bill Brooks, an independently contracted "loss control" inspector to Pimental's insurer at the time, Hartford Fire Insurance Company ("Hartford"). The October 5 Report memorialized Brooks' meeting with Pimental the day before, wherein the latter described the nature of his business. Evidence was given that the typed Report was mailed to Hartford.

Brooks' business as a loss control inspector had nothing to do with the determination of premiums: it was to identify potentially hazardous conditions on Pimental's work sites and make recommendations to minimize the risk of accidents. The mailing reports that at the October 4 meeting, Pimental told Brooks that his business was to install steel-reinforced concrete, and that he had no jobs in prog-

---

**5.** The possibility that the Pimentals overpaid their insurers may provide the otherwise elusive explanation for the USAO's prosecution of this case. As I have said, a state-court civil remedy was available to the Pimentals' insurers. But then again, a civil claim would have no force if, as is quite likely in this case, the insurers could not prove actual damages. Federal mail fraud is a better bet for the

Insurance Fraud Bureau, as it does not require a showing of actual harm, as long as a jury is convinced that Pimental intended to pay lower premiums than were required of him. It is indeed ironic that Pimental is exposed to criminal penalties notwithstanding that—and perhaps *because*—the "victim" insurers might recover nothing from him in a civil suit.

ress. Brooks was therefore unable to visit any work sites.

Pimental argues that there was insufficient evidence to prove, beyond a reasonable doubt, that Brooks' preparation of his Report and subsequent mailing of it to Hartford were reasonably foreseeable to Pimental. The government counters that Brooks took notes at the meeting, such that Pimental could reasonably have believed that a report was to be prepared for mailing to his insurance company. Moreover, mailing was a reasonably foreseeable mode of delivery, given the insurance company's Connecticut location. The causation element is so liberally construed that I have to agree that the mailing of the Account Data Report was foreseeable to Pimental.

■ I am convinced, however, that the mailing was not "in furtherance of the fraud." The government notes that a mailing that enables the continuation of a scheme to defraud establishes the jurisdictional element of mail fraud. *See Schmuck v. United States*, 489 U.S. 705, 711–12, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). The defendant in *Schmuck* maintained a scheme of rolling back the odometers on used cars and selling them to car dealerships at prices that reflected the lower mileage. The mailings charged against Schmuck were title application forms sent to the state by the car dealerships following their resale of the cars. The Court held:

> Although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme.

*Id.* at 712, 109 S.Ct. 1443. Framed another way, as the First Circuit has done in *Pacheco–Ortiz*, sustaining the scheme "de-

pended on" the mailing of those title applications. *Pacheco–Ortiz*, 889 F.2d at 305; *see also Fermin Castillo*, 829 F.2d at 1198 (affirming a mail fraud conviction based on certain telex transmissions because "[i]f any one of them had not been sent, Fermin would not have received his ill-gotten gains").

The mailings in *Schmuck* and *Pacheco–Ortiz* are clearly distinguishable from the Account Data Report in this case. Reports like Brooks' are routinely prepared by loss control inspectors for the purpose of minimizing the risk of accidents in the workplace—or at least satisfying insurers that efforts have been taken toward that end. Though Brooks' Report contains statements from Pimental consistent with the scheme to defraud alleged in the indictment, the scheme in no way *depended* on the relay of those statements from Brooks to Hartford.

It is indeed possible that a Report from Brooks that described Pimental's work as steel erection might have raised an eyebrow, found its way to the department at Hartford that actually did determine Pimental's premiums, and resulted in an upward adjustment in his premiums, so thwarting the alleged scheme to defraud. But there is no evidentiary basis for the jury to believe that, had the Report of loss control inspector Brooks—whose business is not remotely concerned with the process of determining premiums—not been sent to Hartford, the jig would have been up and Hartford would have increased Pimental's premium payments. This is the standard described and applied in *Schmuck* and *Pacheco–Ortiz*: the mailing must be "incident to an essential part of the scheme." *Schmuck*, 489 U.S. at 710–11, 109 S.Ct. 1443.

The government gave no evidence that this letter was incidental to the derivation

of Pimental's premiums. Nor is there any evidence to suggest that, absent any confirmation from loss control inspectors that Pimental did "concrete construction," any investigation into the veracity of his choice of job classification codes would ensue.[6] Accordingly, no rational jury could gather from the government's evidence that the mailing of Brooks' report was at all connected to an essential part of the scheme.

### b. *Count 4: The October 5, 1995, Letter from Hartford to Pimental*

The jury also convicted Pimental of Count 4 of the revised indictment. The mailing featured in this count was an October 5, 1995 letter from Timothy J. Bergeron, a second loss-control inspector,[7] to Pimental himself. The mailing memorialized Bergeron's visit with Pimental on terms and under circumstances similar to Brooks'.

Pimental again disputes the causation element. The government suggests that Bergeron's use of the mails was indeed reasonably foreseeable to Pimental, as he had already received two letters from Bergeron planning the meeting. It does not follow from the fact of those letters that Pimental could expect a letter after the meeting memorializing what had transpired. Nonetheless, the government need only prove that "use of the mails," and not the particular mailing at issue, was reasonably foreseeable. *Fermin Castillo,* 829 F.2d at 1198–99. Here again, I cannot

overrule the jury's determination that this was, in fact, the case.

But no rational jury could have concluded that this mailing was in furtherance of the fraud. Bergeron's letter is even further removed from Pimental's scheme than Brooks'. Bergeron made his visit in the same capacity, and for the same purpose, as Brooks did—not to verify that Pimental was paying the appropriate premiums, but to review work sites and offer suggestions to minimize work hazards. Pimental may indeed have misled Bergeron about the nature of his construction business, and the contents of Bergeron's letter may reflect Pimental's misrepresentations. But the scheme described in the indictment cannot remotely be viewed to depend on the mailing of Bergeron's "confirmation letter" to Pimental.

### B. *The Rule 6(e) Motion*

As Pimental had no constitutional right to secrecy at the grand jury stage, the harmless error standard of Federal Rule of Criminal Procedure 52(a) governs in this case. *United States v. Mechanik,* 475 U.S. 66, 71–72, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). Dismissal of an indictment is therefore appropriate only if a Rule 6(e) violation "substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence" of the violation. *Bank of Nova Scotia v. United States,* 487 U.S. 250, 256, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988).

---

**6.** In fact, the loss control expert "confirmed" nothing. He visited no work sites and merely accepted Pimental's representations. No further investigation followed.

**7.** It is no coincidence that the government came away with convictions on the two counts that featured mailings from loss control inspectors. At the end of his final argument, the prosecutor landed hard on the Pimentals for the information they gave loss control inspectors, insinuating that the Pimentals willingly forfeited opportunities to work with loss control inspectors to improve worker safety. The Pimentals moved for a mistrial on the ground that this was an improper, prejudicial argument; there was no indication that worker safety was ever compromised on the Pimental's job sites. I denied the motion.

Pimental advances four new arguments—based on evidence adduced at trial—that the Rule 6(e) violation substantially influenced the grand jury to indict.

First, Pimental argues that the bank records reviewed by the grand jury "did not speak for themselves." Some explanation of the records, Pimental suggests, was required to distill the several boxes of records into payroll figures—in fact, it was not clear from the face of the records that the bank records even referenced payroll accounts. The U.S. Attorney's Auditor, Tom Zappala, testified at trial to the time and expertise required to ascertain payroll figures from the boxed records. The grand jury did not have Zappala's expertise, and he did not testify before the grand jury: Faragi did, with his spreadsheet summaries.

Second, Pimental contends that Faragi, tagged by the prosecution as an expert witness of workers' compensation law, misled the grand jury. Specifically, Faragi failed to inform the grand jury that Pimental was entitled to parse out his operations among multiple job classification codes. Pimental suggests that the trial testimony of the FBI agent on this case, the three insurance company auditors called as witnesses, and a state workers' compensation board representative all recognized this possibility. Thus the evidence at trial exposed Faragi as something less than an expert for not suggesting this to the grand jury.

Third, Pimental finds fault with the spreadsheets Faragi prepared that allegedly juxtapose his company's actual payroll to the payroll reported to his insurers. Faragi testified a number of times that Pimental's actual payroll was lower than he reported to his insurance auditors. Pimental protests that he was never required to make such reports, and the totals that Faragi identifies as "reported" payroll were actually numbers that the auditors derived from Pimental's records. That many of the numbers posted by Faragi were estimates—and certainly not figures that Pimental volunteered or necessarily accepted as true—is a fact buried in footnotes to the spreadsheets. As a result, Pimental contends that Faragi misled the grand jury in suggesting that he "underreported" his payroll.

Fourth and finally, Pimental takes issue with Faragi's testimony to the grand jury overstating the number of mailings relating to Pimental's scheme to defraud. One member of the grand jury had expressed interest in whether the Pimentals themselves had mailed anything in furtherance of the scheme. Faragi testified that Pimental mailed premium checks to the insurance companies, that Pimental mailed bids to potential clients, and finally that "there are probably hundreds of mailings." The government offered at trial no evidence of any mailings between Pimental and his insurers.

It is the government's view that the conviction in this case mandates a finding of harmless error on the Rule 6(e) violations. It relies upon *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1985), where the Supreme Court found that a subsequent guilty verdict at trial sanitized a Rule 6(d) violation at the grand jury stage. *Id.* at 70, 106 S.Ct. 938. The Court took the view that the petit jury's satisfaction of guilt beyond a reasonable doubt presumes that probable cause, at the very least, supported the indictment. *Id.*

It is worth noting, however, that the defendant in *Mechanik* challenged grand jury proceedings that led to a superseding indictment. A prior grand jury had charged Mechanik with drug offenses and conspiracy; the second, contested grand jury proceeding resulted in an expansion

of the scope of the conspiracy charge. *Id.* at 67, 106 S.Ct. 938. As a result, the defendant's Rule 6(d) motion to dismiss faulted proceedings that resulted in the broadening of the indictment, and not the very decision to indict. *Id.* at 69, 106 S.Ct. 938 ("We assume for the sake of argument that the simultaneous presence and testimony of the two Government witnesses before the grand jury violated Rule 6(d), and that the District Court would have been justified in dismissing *portions of the indictment* on that basis had there been actual prejudice .... (emphasis added))". This fact clearly made a difference to the majority, which emphasized the social costs of retrying the case under the first indictment. *Id.* at 72, 106 S.Ct. 938.

▪ The inference the government would draw from *Mechanik* is that, as long as the government can muster sufficient evidence to secure a guilty verdict at a later date, the strictures of Rule 6 are voluntary for the prosecution. In a concurring opinion critical of the majority's view, Justice O'Connor recognized that it is a rare case that entertains a post-verdict motion to dismiss an indictment under Rule 6. *Id.* at 76, 106 S.Ct. 938 (O'Connor, J., concurring). The free rein that the government's reading of *Mechanik* would give to prosecutors is therefore constrained by the risk that the defense will uncover prejudicial violations prior to trial. But if the jury trial's full airing of the issues reveals, for the first time, the full scope and effect of the violation, and—as is arguably the case here—that new information warrants a finding, under *Bank of Nova Scotia*, that the violation substantially influenced· *the decision to indict* and not merely the *composition of the indictment*,

extension of *Mechanik* [8] to deny a remedy to the defendant would be unjust and unwarranted.

I agree with Justice O'Connor. A petit jury's guilty verdict, reached after a full development of the evidence, says nothing about the strength of a prosecution's case at the time of *indictment*. The majority's suggestion that it does is flawed logic, and worse, it strikes a blow at the core principle of the grand jury process, which is directed at ensuring that defendants are not charged with crimes unless *and until* the government has mustered at least a germ of a case. *Id.* at 73–74, 106 S.Ct. 938 (suggesting that the majority's decision "seriously undermin[es] the grand jury's traditional function of protecting the innocent from unwarranted public accusation".).

▪ In any case, *Mechanik* certainly does not go so far as to suggest that a jury verdict I have found to be unsupported by the evidence necessarily establishes harmless error, particularly where the defects in the trial proof had nothing to do with Faragi's testimony. Nevertheless, I have set aside the guilty verdicts under Rule 29. As the government failed to prove its case, the question of dismissal under Rule 6 is moot. *Mechanik*, 475 U.S. at 77, 106 S.Ct. 938 ("[I]f the jury acquits, the matter is mooted.").

### III. *CONCLUSION*

For the foregoing reasons, Arthur Pimental's Second Supplemental Memorandum in Support of Motion to Dismiss Indictment for Violation of Rule 6 [docket entry #121] is **MOOT**, and Defendant's

---

**8.** For that matter, the Supreme Court has emphasized the importance of case-by-case attention to the particulars of an alleged error over mechanical application of *per se* rules in the harmless error analysis. *United States v.* *Lane,* 474 U.S. 438, 447–48, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986); *see also Mechanik,* 475 U.S. at 77, 106 S.Ct. 938 (O'Connor, J., concurring) (noting the Court's distaste for *per se* rules in the harmless error context).

Rule 29 Motion [docket entry # 120] is **GRANTED**.

**SO ORDERED**.