# United States Court of Appeals
## For the First Circuit

Nos. 03-1098
     03-1153

UNITED STATES OF AMERICA,

Appellant/Cross-Appellee,

v.

ARTHUR L. PIMENTAL,

Defendant, Appellee/Cross-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Lynch, Circuit Judge,
Rosenn, Senior Circuit Judge,[*] and
Lipez, Circuit Judge.

Mark J. Balthazard, Assistant U.S. Attorney, with whom Michael J. Sullivan, U.S. Attorney, was on brief, for appellant.
James C. Rehnquist, with whom Sarah E. Walters, Miriam Kim, and Goodwin Procter LLP were on brief, for appellee.

August 30, 2004

---

[*]Of the Third Circuit Court of Appeals, sitting by designation.

**LYNCH**, **Circuit Judge**.     This workers' compensation insurance fraud criminal case produced an appeal from both sides. The government appeals the district court's dismissal of two counts on which a jury had convicted, while the defendant cross-appeals on the ground that the entire case should have been dismissed because of an alleged violation of the grand jury secrecy rule, embodied in Fed. R. Crim. P. 6(e).     We conclude, despite the able representation of Pimental, that (1) the district court erred in dismissing the two counts and we reinstate the jury convictions and conclude that (2) there was no violation by the prosecution here of Rule 6(e) at all.     This second point is a matter of first impression.

After a jury convicted Arthur Pimental of two counts of mail fraud, the district court dismissed the convictions because it found that the two underlying mailings were not "in furtherance" of Pimental's fraudulent scheme. United States v. Pimental, 236 F. Supp. 2d 99 (D. Mass. 2002).  Pimental's scheme involved lying to various workers' compensation insurance company representatives about the nature and scope of his company's work; his false statements tended to reduce the premium payments he owed for workers' compensation insurance.    The government appeals the district court's decision, arguing that the two mailings furthered Pimental's scheme by helping to ensure that the insurance company did not discover his earlier misrepresentations.

-2-

Pimental cross-appeals, arguing that his indictment should be dismissed because the prosecuting attorney disclosed secret grand jury materials to an investigator for the Massachusetts Insurance Fraud Bureau (IFB). Pimental argues that the rule allowing disclosure of grand jury materials to "government personnel" in certain circumstances, Fed. R. Crim. P. 6(e)(3)(a)(ii), was inapplicable because the IFB investigator was a private actor. The IFB, which investigates potential cases of insurance fraud, is authorized and structured by Massachusetts statute, but partially run and entirely funded by insurers.

We reverse the district court's dismissal of Pimental's convictions, finding that the mailings by insurance company representatives that formed the basis of the two counts of conviction were indeed in furtherance of Pimental's fraudulent scheme. Additionally, we reject Pimental's cross-appeal because we conclude that the first district court (not the trial court) did not err when it found the IFB investigators here are "government personnel" within the meaning of Fed. R. Crim. P. 6(e)(3)(A)(ii) and so authorized the prosecutor to reveal grand jury materials to them.

## I.  Factual Background

The facts are described in the light most favorable to the jury's guilty verdict.

Arthur Pimental and his wife, Loretta Pimental (for ease of reference we refer to her as Loretta and to Arthur as Pimental), owned and operated Pimental Steel Erectors ("Pimental Steel") starting sometime in the early 1980's. In late 1989, Pimental Steel allowed its workers' compensation insurance to lapse; this violated Massachusetts law. Massachusetts requires all employers to maintain workers' compensation insurance which covers their employees in the case of an on-the-job injury or job-related illness. Mass. Gen. L. ch. 152, § 25A. Over three years later, in April 1993, Arthur Pimental mailed a written application to the Massachusetts Workers' Compensation Rating and Inspection Bureau (MWCRIB) to resume Pimental Steel's workers' compensation coverage. MWCRIB, a private non-profit association of insurers that is licensed under Massachusetts law, Mass. Gen. L. ch. 152. § 52C, uses a risk pool to assign insurance companies to provide workers' compensation insurance on pre-set terms to applicant-employers. The fraud charges started here.

On the MWCRIB application form, Pimental described the operations of his business as involving "concrete construction incl[uding] foundations" and added that it "puts in foundations." Concrete foundation work involves laying concrete and reinforcing it with steel rods and is also known as "rebar." MWCRIB processed the application, assigned it to the Hartford Fire Insurance Company ("Hartford Insurance"), and notified Pimental via the mail that the

-4-

estimated premium for the year, based on his application, was $12,425.

Despite what was said in the MWCRIB application, Pimental Steel had never at any point been involved in concrete foundation work. Rather, throughout the relevant period, its business performed mainly steel erection and related work, such as welding and decking. Steel erection involves the placement of girders, columns, and joints to support a structure, then laying corrugated-metal decking for the ceiling and floors of the building and welding it into place. Steel erection work carries a significantly higher risk of injury than does concrete foundation work.

Because workers' compensation premiums are set based upon the kind of work performed and the amount of a business's payroll, Pimental's incorrect description on the MWCRIB application affected the premium payments Pimental Steel owed. In 1993, the premium payment for steel erection of structures over two stories was $99.35 per every hundred dollars of payroll[1] (reduced to $69.22 for structures under two stories), while the rate was $41.22 for concrete foundation work. Some of the work that Pimental Steel actually performed, however, had <u>lower</u> premium rates than concrete foundation work: the rate for decking was $24.66 or $19.82,

_____

[1]All subsequent references to premium rates are per hundred dollars of payroll.

-5-

depending on the type of metal used, while the rate for welding was $23.56. Where, as in the case of Pimental Steel, employees perform tasks that have different premium rates, the total premium cost can be calculated by parsing out the hours that employees spent on each different task, so long as appropriate documentation is maintained. One witness testified that 80% of the work Pimental Steel did for him was steel erection and decking and that the remaining 20% was "miscellaneous."

In September of 1993, Joseph F. Brugman, an auditor for Hartford Insurance, met with Loretta Pimental to perform an initial audit on Pimental Steel's insurance application. In addition to such initial audits, which are conducted at the start of an insurer's relationship with an insured, insurers normally perform audits once a year at the conclusion of each annual policy period. The auditors determine the insurance classification for the work that the insured's employees performed and the total amount of salary paid to them. Using this information, the insurance companies calculate the final amount that the employer owes for the year.

During the initial audit meeting, Loretta told Brugman that Pimental Steel was, as the MWCRIB application had represented, involved in concrete foundation work. She did not tell Brugman that Pimental Steel was involved in any way in steel erection, welding, or decking, even though Brugman explained to her that

Pimental Steel's operations could be split into different classifications for insurance purposes. At the later year-end audit in July 1994, also conducted by Brugman, Loretta repeated this description of Pimental Steel's business operations.

Several months after Brugman conducted his year-end audit, William Brooks, a loss-control inspector for Hartford Insurance, met with Arthur Pimental. In contrast to auditors, the purpose of loss-control inspectors is not to verify the accuracy of the information given by policyholders, but instead to "assist[] policyholders in their efforts to control costly accidents and/or injuries." During that meeting Pimental once again represented, wrongly, that his business involved rebar. Pimental also told Brooks that he did not currently have any employees and that there were not any ongoing projects that Brooks could observe. This was also not true: Pimental paid an employee wages three days after his meeting with Brugman.

On October 5, 1994, Brooks mailed an "Account Data Report" to Hartford Insurance that summarized his meeting with Pimental. The letter began by stating that "[t]he insured describes his business []as that of the installation of reenforcing bars and rods for floors and walls." Brooks's standard practice is to inform insureds that he will turn over a copy of his loss-control report to the insurance company, and that the company will inform the employer of any recommendations to improve worker

safety. However, Brooks testified that he had no specific recollection of whether he had informed Pimental of this procedure during their meeting.

The Pimentals renewed their workers' compensation insurance coverage with Hartford Insurance in May 1995. Hartford sent them a letter detailing the terms of coverage; under the heading "Business of Named Insured," the letter read "concrete construction." In July 1995, Hartford auditor Mark Lawrence met with Loretta Pimental to conduct an audit of the May 1994 to May 1995 policy period. During that meeting, Lawrence asked Loretta if the company did any steel erection work, given that the company's name is "Pimental Steel Erectors." Loretta responded that the company only did concrete rebar work, and did not work on steel erection, despite its name.

Lawrence also asked Loretta for documentation of Pimental Steel's wage payments to employees. Loretta told Lawrence that there was no single record detailing payroll. Instead, she provided him with a checkbook that had been used to make payroll payments, along with a written summary of that checkbook, and told him that there were no additional records. From these documents, Lawrence calculated that Pimental Steel had paid $28,885 in salary to its employees for the year from May 1994 to May 1995, resulting in a total premium of $13,586. In fact, Pimental Steel's actual payroll during that period was $85,499, a figure which would have

led to a larger premium. The Pimentals used non-sequentially numbered checks in their business and it appears that the single checkbook given to Lawrence contained only a fraction of all the checks written on behalf of Pimental Steel from the previous year.

In July 1995, Hartford Insurance attempted to arrange another loss-control meeting with Arthur Pimental. After Pimental did not respond to three separate inquiries, Timothy Bergeron, a Senior Loss-Control Consultant for Hartford Insurance, sent him a final letter stating that "failure to allow reasonable access for the purpose of loss-control consultation is a violation of the good faith provisions in the Workers' Compensation Insurance Plan and can subject your policy to cancellation." Under that threat of cancellation, Pimental finally met with Bergeron on September 21, 1995.

During the meeting, Pimental told Bergeron that Pimental Steel continued to perform rebar work; he falsely said the company did not perform any structural steel erection or metal deck work. He also falsely told Bergeron that there were currently no jobs in progress that could be inspected. His bank records reveal, however, that three employees were paid their wages that same day. During the meeting, Bergeron told Pimental that he was going to prepare a report summarizing their meeting and would mail it to Hartford Insurance. Bergeron testified that he told Pimental that he would send the loss-control report to Hartford Insurance, and

Brooks indicated that it was his standard practice to tell the insured that the loss-control report would be forwarded to the insurance company. Bergeron kept a copy of the report in Hartford Insurance's Boston branch (where he was stationed) and sent a copy to the company's branch in San Antonio, Texas "that issues the policy and distributes all the policies regarding the assigned risk pool." On October 5, 1995, Bergeron also mailed a letter to Pimental summarizing their meeting and stating that "[y]our company continues to bid work as a subcontractor installing reinforcement bar."

Pimental again renewed the company's workers' compensation insurance in May 1996, and Hartford Insurance again mailed a letter to Pimental detailing the coverage and repeating that the nature of the company's business was "concrete construction." Later that summer, Lawrence wrote a letter to the Pimentals requesting certain documents that were needed to perform a year-end audit for the May 1995-to-May 1996 coverage period. The Pimentals never provided Lawrence with any of the requested documentation.

When Lawrence met with Loretta Pimental for the annual audit on August 9, 1996, the only documentation that she provided was Pimental Steel's checkbook; she claimed to have been unaware of the records Lawrence had requested and to have lost the letter he had sent to her. As a result, Lawrence determined that Pimental

Steel's account was "unauditable" and his report to Hartford Insurance simply estimated a payroll of $31,500 based on the checkbook that Loretta had provided. This estimate was less than 20% of Pimental Steel's actual payroll of $158,653 for that time period. Consequently, the $19,374 in premiums that the Pimentals were charged was also less than 20% of what they actually owed.

In November 1996, Arthur Pimental, perhaps concerned that Hartford Insurance might cancel Pimental Steel's policy for failure to provide requested documentation, submitted a second application for workers' compensation insurance to MWCRIB. This application contained a new name for the company; it was now called A.P.S. Products, Inc., rather than Pimental Steel Erectors. (We continue to refer to Pimental's company as "Pimental Steel" despite this name change). The application once again described the company's operations as "[i]nstall steel for concrete reinforcement," and stated that its total payroll was $65,000 per year and that it employed only two workers. During the previous six months, the Pimentals' company actually paid salary to between four and seven employees on a weekly basis, and the company's payroll for those six months totaled approximately $83,000.

MWCRIB assigned the insurance application to Employers Insurance of Wausau (Wausau Insurance) and sent a letter to Pimental informing him of the assignment and stating that the estimated premium was $37,600. The Pimentals then began a pattern

-11-

of deception with Wausau Insurance similar to that employed with Hartford Insurance. Arthur told auditors for Wausau Insurance that A.P.S. Products did concrete rebar construction rather than the steel erection, welding, or decking work that it actually performed. Loretta, in turn, initially provided Wausau Insurance with incomplete records that significantly underrepresented the company's payroll.

As part of a block transfer of policies, MWCRIB reassigned the Pimentals' insurance coverage from Wausau Insurance to Savers Property & Casualty Insurance Company ("Savers Insurance") in October of 1997. Using the 1996 MWCRIB application as well as Wausau's most recent policy, Savers Insurance initially calculated a $33,671 yearly premium based on a $65,000 payroll in concrete rebar. Once again, the Pimentals misrepresented the nature of their business to Savers Insurance. Arthur Pimental told a loss-control inspector for Savers Insurance that his company only worked on concrete rebar. Further, the Pimentals failed to respond to several inquiries from Savers Insurance auditors, resulting in Savers Insurance using a 50% increased payroll figure of $97,500 for the 1997-to-1998 coverage period. This was still substantially smaller than the actual payroll figure of $168,162.

In total, from October 1993 to August 1998, the Pimentals paid their employees approximately $738,000 in salary. The insurance premiums they paid during this period were based on a

-12-

payroll of less than half that amount -- about $340,000. Throughout the time period, the Pimentals paid premium rates for concrete rebar even though their work consisted almost entirely of steel erection, welding, and decking. Because different premium rates apply to each of these three activities and there was little evidence concerning how many employee hours were dedicated to each separate activity, the extent of the monetary benefit the Pimentals received from misrepresenting their business is unclear.[2] A jury could easily infer that the premiums would have been higher if Pimental had been honest in what he told his insurers.

## II. Procedural History

On September 29, 1999, Arthur and Loretta Pimental were each indicted on one conspiracy count, 18 U.S.C. § 371, and fourteen counts of mail fraud, 18 U.S.C. § 1341. Before trial, the Pimentals moved to dismiss the indictment, claiming that the government had violated Fed. R. Crim. P. 6(e) when it disclosed, after earlier receiving permission from another judge on the court to do so, grand jury materials to an investigator for the Insurance Fraud Bureau of Massachusetts. Pimental, 236 F. Supp. 2d at 103. In a trio of pretrial opinions, the district court held that there had been a Rule 6(e) violation (despite the prior approval of a

_____

[2]Indeed, Pimental stresses on appeal that it is possible that he actually lost money from misrepresenting the type of operations his company performed, because some of those operations were cheaper to insure than was concrete rebar.

-13-

different judge of the court), but held that the violation was harmless because the grand jury testimony that resulted from the transmittal of information to the IFB investigator was not crucial to the grand jury's decision to indict.  United States v. Pimental, 204 F.R.D. 223 (D. Mass. 2001); United States v. Pimental, 201 F.R.D. 24 (D. Mass. 2001); United States v. Pimental, 199 F.R.D. 28 (D. Mass. 2001).

The government voluntarily dismissed three of the mail fraud counts on September 16, 2002, and the case proceeded to trial the next day.  Pimental, 236 F. Supp. 2d at 104.  After six days of testimony, a jury acquitted Loretta Pimental on all counts and acquitted Arthur Pimental on the conspiracy count and nine of the eleven mail fraud counts.  The two mail fraud counts on which the jury convicted Arthur Pimental were both based on mailings sent by loss-control inspectors.  The first count was premised on the October 5, 1994 mailing from William Brooks to Hartford Insurance, in which Brooks reported that Arthur Pimental had said that Pimental Steel Erectors only performed concrete rebar work.  The second count was based on the letter from Timothy Bergeron to Arthur Pimental summarizing their meeting and noting that Pimental Steel was, according to Pimental, involved only in concrete rebar work.

After the jury returned its verdict, Arthur Pimental moved for a judgment of acquittal pursuant to Federal Rule of

Criminal Procedure 29(c). He also renewed his motion for a dismissal of the indictment, arguing that evidence presented at trial provided a previously unavailable basis for believing that the information disclosed to the IFB investigator had substantially influenced the grand jury's decision to indict.

The district court held that there was sufficient evidence for the jury to find the existence of a scheme to defraud and that the mailings were reasonably foreseeable. Id. at 109, 110. But it nonetheless granted Pimental's Rule 29 motion because it concluded that there was not sufficient evidence that either mailing was in furtherance of the fraudulent scheme. Id. It also declined to rule on Pimental's renewed motion for dismissal of the indictment based on the Rule 6(e) violation, finding that this issue was mooted by its grant of the Rule 29 motion. Id. at 112.

The government appeals the district court's grant of the Rule 29 motion. Arthur Pimental, in turn, cross-appeals the denial of his motion to dismiss the indictment for the Rule 6(e) violation.

### III. The Rule 29 Motion

Our review of the district court's Rule 29 determinations is de novo. United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002). A judgment of acquittal should only be granted when the evidence and all reasonable inferences to be drawn from the evidence, both taken in the light most favorable to the government,

-15-

are insufficient for a rational factfinder to conclude that the prosecution has proven, beyond a reasonable doubt, each of the elements of the offense. Id.; United States v. Campbell, 268 F.3d 1, 6 (1st Cir. 2001). "Under this formulation, a court considers all the evidence, direct and circumstantial, and resolves all evidentiary conflicts in favor of the verdict." Moran, 312 F.3d at 487.

To demonstrate a violation of the mail fraud statute, 18 U.S.C. § 1341, the prosecution must prove "(1) the devising or attempting to devise a scheme or artifice to defraud; (2) the knowing and willing participation in the scheme with the specific intent to defraud; and (3) the use of the mails in furtherance of the scheme." United States v. McCann, 366 F.3d 46, 51 (1st Cir. 2004) (quoting United States v. Montminy, 936 F.2d 626, 627 (1st Cir. 1991)). The government must also demonstrate, in order to prove causation, that the defendant knew, or could have reasonably foreseen, that "the use of the mails [would] follow in the ordinary course of business." Pereira v. United States, 347 U.S. 1, 9 (1954); cf. United States v. Fermin Castillo, 829 F.2d 1194, 1198-99 (1st Cir. 1987) (interpreting wire fraud statute). "It is not necessary to prove that the defendant personally executed the mailings, but merely that the defendant 'caused the mailing by doing some act from which it is reasonably foreseeable that the mails will be used.'" United States v. Bruckman, 874 F.2d 57, 60

-16-

(1st Cir. 1989) (quoting United States v. Gonzalez-Sanchez, 825 F.2d 572, 588 (1st Cir. 1987)).

There was easily sufficient evidence for the jury to find the existence of a scheme to defraud and that the use of the mails was reasonably foreseeable, as discussed below. As to the "in furtherance of" requirement, the district court erred in holding that there was not sufficient evidence for the jury to find that the two loss-control inspectors' mailings were in furtherance of the fraudulent scheme. Accordingly, we reverse the grant of the Rule 29 motion and reinstate the convictions.

A.  The Existence of a Scheme to Defraud

Pimental challenges the district court's conclusion that there was sufficient evidence of a scheme to defraud, hoping to knock out the convictions on grounds other than those relied upon by the district court.[3]  First, he argues that the evidence at trial did not establish that Pimental Steel's employees were

---

[3]As recounted in Part I, there was significant evidence that, in addition to lying about the nature of Pimental Steel's operations, Pimental also lied about the size of the company's payroll. Pimental says that this evidence "only established that in workers' compensation insurance applications, [he] made estimates of the payroll, which often vary widely from the actual payroll, particularly in the construction industry." Not so. There was more than sufficient evidence for the jury to find that Pimental did indeed misrepresent the size of Pimental Steel's payroll in an effort to defraud the insurance companies. Nonetheless, in order to simplify the analysis of whether Count Four was in furtherance of the fraudulent scheme, see infra Part III.B.ii., we focus on Pimental's misrepresentations concerning the nature of Pimental Steel's operations.

actually covered by workers' compensation insurance when they were performing steel erection. Pimental says the jury had no way of eliminating the possibility that if he had submitted a claim on behalf of an injured employee, the insurance company would have discovered the incorrect premium payments and thus refused to pay the employee. Pimental does not contest the district court's conclusion that, as a matter of Massachusetts law, the insurance company would be obliged to cover Pimental Steel's employees under such circumstances.[4] Pimental, 236 F. Supp. 2d at 106 (relying on Employers Mutual Liability Insurance Co. of Wisconsin v. Merrimac Mills Co., 325 Mass. 676, 681 (1950)). But he says that there was no evidentiary basis for the jury to reach this conclusion. From this premise, Pimental argues that the jury could not have found that the insurers suffered any loss as a result of Pimental's actions. And that, concludes Pimental, means that there was insufficient evidence for the jury to conclude that there existed a "scheme to defraud."

Pimental's argument goes too far. In order to find a "scheme to defraud," the jury simply had to determine that Pimental was attempting to "wrong[] one in his property rights by dishonest methods or schemes." McNally v. United States, 483 U.S. 350, 358 (1987) (quoting Hammerschmidt v. United States, 265 U.S. 182, 188 (1924)). Here, there was more than sufficient evidence for the

---

[4]As Pimental does not raise this issue, we do not address it.

jury to conclude that Pimental lied about the nature of his company's work in order to pay cheaper premiums on his workers' compensation insurance. The jury easily could have concluded that Pimental was attempting to dishonestly minimize the insurance premiums to the company that he should have been paying under Massachusetts law. The speculative possibility that if an employee had filed a claim with Hartford Insurance, it would have discovered Pimental's lies and refused to pay the employee is irrelevant. To convict, the jury need not have drawn any additional conclusion.

Pimental also argues that there was insufficient evidence of a scheme to defraud because the evidence was inconclusive as to whether he ultimately paid premiums that were less than what he actually owed, for the reasons discussed earlier. But whether Pimental actually paid more or less in premiums than he actually owed goes only to the success of his fraudulent scheme, not to its existence. See United States v. Martin, 228 F.3d 1, 16 (1st Cir. 2000) (success in scheme is not needed to support mail fraud conviction). In addition, the argument fails on its own terms. A rational jury could have found that Pimental, because of his own actions, did not in fact have the option of making variable premium payments according to the amount of time that his workers spent performing different job tasks. The evidence at trial established only that:

> The payroll of an individual employee may be divided and allocated to more than one classification, provided the

-19-

> entries in the original records of the insured disclose
> an allocation of each such individual employee's payroll.
> Any such operation for which separate payroll records are
> not maintained shall be assigned to the highest rated
> classification which applies to the job or location where
> the operation is performed.

(emphasis added). There was extensive testimony that the Pimentals specifically chose not to keep records documenting the breakdown of their employees' work and that they repeatedly misled the insurance company concerning their payroll in order to pay lower rates. A reasonable jury could have easily found that the Pimentals did not maintain "separate payroll records" and hence that the rate they should have paid, for all payroll hours, was the rate for steel erection. This would have been significantly more than the amount they actually paid.

B.  The "In Furtherance Of" Requirement

In order for a mailing to be "in furtherance" of a fraudulent scheme, it "must be for the purpose of executing the scheme," United States v. Maze, 414 U.S. 395, 399-400 (1974) (quoting Kann v. United States, 323 U.S. 88, 94 (1944)), or "part of the execution of the scheme as conceived by the perpetrator at the time," Schmuck v. United States, 489 U.S. 705, 715 (1989). The mailing "need not be an essential element of the scheme"; it can be merely "incident to an essential part of the scheme," id. at 710-11 (quoting Pereira, 347 U.S. at 8), or "a step in [the] plot," id. at 711 (quoting Badders v. United States, 240 U.S. 391, 394 (1916)); see also McCann, 366 F.3d at 52.

-20-

(i)  Count Two Conviction -- Brooks's Account Data Report

The mailing that formed the basis of Count Two, on which the jury convicted Pimental, was Brooks's October 5, 1994 "Account Data Report" to Hartford Insurance, which recounted the substance of his loss-control interview with Pimental.  In that report, Brooks wrote that Pimental had said that his business involved only rebar construction.

In Schmuck, the Supreme Court addressed the "in furtherance of" requirement with respect to a mailing of some similarity to Brooks's loss-control report.  The defendant in Schmuck purchased used cars, rolled back their odometers, and then resold them to retail dealerships, who, in turn, sold them to consumers.  489 U.S. at 707.  The Court held that the mailing of a title-application form from the dealership that purchased Schmuck's vehicle to a state agency, at the time of the dealership's sale of the car to the end-consumer, met the "in furtherance of" element of the mail fraud statute.  Id. at 710-12.  In cases of "ongoing fraudulent venture[s]," reasoned the Court, mailings that help maintain a harmonious relationship between the perpetrator and the victim further the fraudulent scheme by helping to ensure its continued success in the future.  Id. at 711-12.  Even though such mailings were not absolutely necessary for the scheme to succeed in the short term, they allowed the dealerships who purchased the cars from Schmuck to sell them to the ultimate consumer and thus helped

-21-

guarantee that the dealerships would continue to purchase cars from Schmuck in the future.  Id.

Likewise, the mailing from Brooks to Hartford Insurance helped Pimental maintain his ongoing fraudulent venture by ensuring that he continued to receive insurance coverage.  The jury was entitled to conclude that had Brooks never mailed his loss-control report, Hartford Insurance would have terminated its insurance coverage and Pimental's scheme would have, at least temporarily, come to a halt.  Indeed, Pimental's policy with Hartford Insurance was threatened with cancellation when he attempted to avoid a loss-control interview in the summer of 1995 by ignoring repeated inquiries from Bergeron.  If Hartford Insurance were not to receive a completed loss-control report, Bergeron's letter warned, Pimental's insurance coverage would be "subject . . . to cancellation."  A rational jury could have readily found that the loss-control report from Brooks to Hartford Insurance furthered Pimental's fraudulent scheme because it was a necessary step in the continued relationship between Pimental and his victim, Hartford Insurance. Cf. United States v. Woodward, 149 F.3d 46, 64-65 (1st Cir. 1998) (in ongoing scheme in which lobbyist made illegal purchases for a public official, the mailing of a credit card bill to the lobbyist satisfied the "in furtherance of" requirement because if the lobbyist "did not pay [the] bills, his credit line

would have been terminated and the gratuities could not have continued").

The district court reached the opposite conclusion by relying on a statement in a post-<u>Schmuck</u> First Circuit case, <u>United States</u> v. <u>Pacheco-Ortiz</u>, 889 F.2d 301, 305 (1st Cir. 1989), that the perpetration of the fraud or its subsequent cover-up must have "depended in some way on" the mailing. <u>Pimental</u>, 236 F. Supp. 2d at 108. The court interpreted this formulation to impose a "but for" test for the "in furtherance of" element of mail fraud -- i.e. that a fraudulent scheme "depends on" a mailing only when but for that mailing, the scheme could not have succeeded or would have been discovered.[5] The district court concluded that <u>Pacheco-Ortiz</u>'s use of "depends on" meant "but-for" despite language in <u>Pacheco-Ortiz</u> that also said that it was not necessary that each mailing guarantee the success of the scheme or even significantly advance it -- that it only need be closely related to the scheme. 889 F.2d at 305.

---

[5]The flexibility of the English language is one of its wonders; that flexibility can lead to misunderstandings. <u>Pacheco-Ortiz</u> simply said that "for the mailings to be considered in furtherance of the scheme, the scheme's completion or the prevention of its detection must have <u>depended in some way</u> on the mailings." 889 F.3d at 305 (internal quotations omitted) (emphasis added). It did not say there was a "but-for" requirement. The dictionary does say that the word "depend" can mean that something is "a necessary condition," but the word can also mean "to have a connection or relationship as a subordinate part or appurtenance." <u>Webster's Third New International Dictionary</u> 604 (1993).

Applying its approach, the district court found that there was no evidence that, absent the mailing of the loss-control report, Hartford would necessarily have uncovered the scheme and terminated Pimental's coverage. Although the court noted that it was possible that a loss-control report describing the Pimentals' business as steel erection "might have raised an eyebrow" at the insurance company, it concluded that the government did not present sufficient evidence on this point; the evidence did not demonstrate that "the jig would have been up" had Brooks's loss-control report stated that the Pimentals' business was steel erection. Id.

The district court's search for a direct, but-for, link between Brooks's mailing and the fraudulent element of Pimental's scheme -- the claim that his business involved concrete rebar and not steel erection -- misapprehended the law in two ways. First, a mail fraud conviction does not require the existence of a "but-for" link between the mailing and the fraud, or its cover-up. Such a rule would harken back to the oft-rejected notion that the mailing needs to be connected with the essence of the fraud. It need not be, so long as it is "incident to an essential element of the fraud." See Schmuck at 710-11. For instance, in Schmuck itself there was no but-for relationship between the success of the scheme and the mailing of the title-application form. Schmuck could have continued selling cars that had been tampered with even if the dealerships that bought those cars did not mail the title-

-24-

application forms. The mailings were nonetheless "in furtherance" of the scheme because they contributed to its overall success by making it more likely that dealerships would come back to Schmuck to purchase more cars.

Similarly, mailings that are designed to "lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendant[] less likely than if no mailings had taken place" are sufficient under the statute. United States v. Lane, 474 U.S. 438, 451-52 (1986) (quoting Maze, 414 U.S. at 403) (emphasis added); United States v. Lopez, 71 F.3d 954, 961-62 (1st Cir. 1995). Preventing the detection of an ongoing or a completed fraudulent scheme is not contingent on lulling the victim into a false sense of security. Instead, lulling the victim into a false sense of security contributes to the prevention of the scheme's detection by making detection of the scheme less likely. This is sufficient to satisfy the "in furtherance of" requirement of the mail fraud statute. See, e.g., McCann, 366 F.3d at 53 (letter sent after the culmination of the fraud was in furtherance of fraud because it "served the important purpose of decreasing the risk of detection"); Lopez, 71 F.3d at 956-57, 961 (fax sent two years after culmination of fraud that attempted to explain certain documents that were submitted to cover-up the illegal withdrawal was in furtherance of fraudulent scheme in wire fraud conviction

because it made defendant's apprehension less likely); United States v. Young, 955 F.2d 99, 108 (1st Cir. 1992) (Breyer, J.) (mailings that misrepresented disposition of embezzled funds helped conceal the fraud and were thus sufficient to meet the "in furtherance of" requirement).

A second, independent, problem with the district court's analysis is that it focused exclusively on Pimental's misrepresentations in determining whether the mailings furthered his overall scheme. In fact, even under the district court's overly stringent and incorrect but-for test, the jury would have been entitled to conclude that Pimental's scheme depended on Brooks's mailing. The reason is that the success of the scheme did not simply depend on Pimental lying about the nature of his business's operations -- it also depended, among other things, on the mailing and processing of loss-control reports. Were those reports not mailed, there was significant evidence that Hartford Insurance would have cancelled the Pimentals' coverage. One of the central points of Schmuck is that a mailing that is itself innocent and that seems to accomplish an innocent end can nonetheless be in furtherance of a fraudulent scheme.

ii. Count Four Conviction -- Bergeron's Mailing to Pimental

The second Count on which Pimental was convicted is premised on Bergeron's mailing to Pimental himself of a summary of the loss-control interview. In this mailing, Bergeron states,

-26-

based on what Pimental said in the interview, that Pimental's business continued to be the installation of concrete reinforcement bar.

Pimental argues that whether he received a summary of his meeting with Bergeron was immaterial to whether Hartford Insurance would continue to provide the Pimentals with insurance for their employees at the incorrect rate. Pimental also argues that lying to loss-control inspectors as opposed to lying to auditors was not an essential part of the scheme. This was particularly so, says Pimental, because the evidence was that the loss-control division of Hartford Insurance was entirely separate from the division that set premiums and investigated fraud. Indeed, Brooks was not even an employee of Hartford Insurance, but was instead an independent contractor.

A reasonable jury easily could have concluded that Pimental needed to be or thought he needed to be consistent in his lies to representatives of the insurer, regardless of who the representative was. It is not hard to infer that an inconsistent report from a loss-control inspector could somehow trigger alarms in the premium setting group. The harder question is why a letter to Pimental, recounting his fraudulent statements, was in furtherance of the fraud. There are several responses. One is that Pimental now knew that his deception of the inspector was successful -- his copy showed that his lies were being sent to the

company records. This could only encourage him in the scheme. Further, there was an obvious purpose to Bergeron sending a summary of his report to Pimental -- it allowed Pimental to correct any inaccurate information on the report. Pimental chose not to correct the misinformation, thus perpetuating the fraud and demonstrating further his fraudulent intent. See United States v. Morrow, 39 F.3d 1228, 1236-37 (1st Cir. 1994) (in insurance fraud scheme, the insurance company's mailing to the insured acknowledging that it had received the fraudulent claim was, under the Schmuck formulation, "'incidental' to an essential element in the scheme").

C. Causation: Were the Mailings Reasonably Foreseeable?

Pimental argues that there was insufficient evidence for the jury to conclude that he "caused" either of the mailings at issue because neither of them was reasonably foreseeable. See Pereira, 347 U.S. at 8-9. There was no evidence, according to Pimental, of a "course of business" between himself and his insurers that would have led a reasonable person to have anticipated either of the mailings that formed the basis for his convictions. He points to evidence that Brooks could not recall ever telling Pimental that the loss-control report would be mailed to Hartford Insurance. Similarly, Bergeron testified only that he told Pimental that he would send the loss-control report to Hartford, not that he would send it to Pimental himself. All of

-28-

this, concludes Pimental, means there was no way that he could reasonably foresee that either Brooks's or Bergeron's letters would ever be written or mailed.

Pimental's arguments are premised on an incorrect understanding of the law. As the district court correctly held, it is simply the "use of the mails" in the course of the scheme rather than the particular mailing at issue that must be reasonably foreseeable for the causation element of a mail fraud offense to be satisfied.[6] See Morrow, 39 F.3d at 1237 (all that is required to show causation is that the defendant "participated in a crime in which it was foreseeable . . . that the mails would be used" and that was satisfied where defendant "admitted at trial that he knew that automobile insurance claims are processed in part through the

---

[6]The facts of Bruckman clearly illustrate this principle. The defendant in that case submitted a fraudulent financial statement to a bankruptcy court in connection with the attempted purchase of a corporation under that court's protection. 874 F.2d at 59-60. The bankruptcy court's subsequent mailings of the statement to the corporation's creditors formed the basis for the defendant's convictions. Id. at 60. In responding to Bruckman's causation argument, the court held that it was not necessary for the bankruptcy court's mailings to the company's creditors to have been reasonably foreseeable. Rather, it was sufficient that there "was ample evidence from which the jury could conclude both that Bruckman participated in the scheme to defraud, and that some use of the mails was to be anticipated in the course of such scheme." Id. (emphasis added). Because the "jury could reasonably infer that mailings would be foreseeable in the course of the bankruptcy reorganization proceedings related to the intended acquisition of [the corporation] by Bruckman and others," there was sufficient evidence for the jury to conclude "that Bruckman knowingly caused the mailings" at issue. Id.

use of the mails"); <u>Bruckman</u>, 874 F.2d at 60 ("[T]he causation element is met as long as some use of the mails was reasonably to be anticipated in the course of the scheme."); <u>Fermin-Castillo</u>, 829 F.2d at 1198 ("As long as some use of the instrumentality in the course of the endeavor was reasonably to be anticipated, the causation requirement is met."); <u>see also</u> <u>United States</u> v. <u>Bortnovsky</u>, 879 F.2d 30, 38-39 (2d Cir. 1989) (noting that the causation element of mail fraud "has been so liberally construed as to suggest that it requires only that the use of the mail itself, rather than a particular mailing, be reasonably foreseeable" and endorsing that view).

The principle that it is the use of the mails (rather than the specific mailing that is charged) that must be reasonably foreseeable as a result of the scheme is affirmed by one of the primary cases upon which Pimental relies.[7] In <u>United States</u> v.

_____

[7]Pimental also relies on <u>United States</u> v. <u>Smith</u>, 934 F.2d 270 (11th Cir. 1991), which is indeed in tension with our analysis. That case involved an insurance fraud in which the defendant faked an injury from a staged automobile accident. <u>Id.</u> at 271. The defendant received a claims draft, which is similar to a check, in person from the insurance agent, but a copy of the draft was sent to the insurance company. <u>Id.</u> The court found that there was insufficient evidence that the use of the mails was reasonably foreseeable because it was not common knowledge that insurance companies mail accounting copies of drafts. <u>See id.</u> at 273. In so holding, the court agreed "that it is foreseeable that communications involving the policy, the details of the claim, or requests for the payment of the claim would be mailed." <u>Id.</u> But the court found this to be irrelevant because "the substantive counts of [the defendant's] indictment did not allege such mailings." <u>Id.</u>
   To the extent that <u>Smith</u> is inconsistent with our analysis, we

-30-

Walters, 997 F.2d 1219 (7th Cir. 1993), the court held that there was insufficient evidence on the causation element of a mail fraud offense because the evidence did not establish "that [the defendant] conceived a scheme in which mailings played a role." Id. at 1222. Rather than focus on the predictability of specific mailings in the indictment, the Walters court thus premised its analysis on the question of whether the use of the mails, as a general matter, was a foreseeable component of the scheme to defraud. See id. at 1223-24. Indeed, in the course of its analysis, the court noted that insurance fraud is the "paradigm" case in which the use of the mails is reasonably foreseeable because the payment and submission of insurance claims typically involves mailings between the insurance company's agents and the insured. See id. at 1223. So here.

## IV. Pimental's Cross-Appeal

During its preliminary investigations in this case, the U.S. Attorney's office filed an ex parte motion with the district court seeking permission, on the basis of the exception to grand jury secrecy, to disclose grand jury materials to investigators and analysts of the IFB. The exception allows disclosure of grand jury materials to "any government personnel -- including those of a state or state subdivision" when such disclosure is necessary to prosecute a criminal case. Fed. R. Crim. P. 6(e)(3)(A)(ii). The

reject its approach.

-31-

district court motion judge, who was not the trial judge, granted the motion without opinion. No disclosure was made by the prosecutor without court permission.

Subsequently, during pretrial discovery, Pimental moved to dismiss the indictment, arguing that the government had violated Rule 6(e) when it disclosed to Scott Faragi, an IFB investigator who later testified before the grand jury, Pimental's bank records and other material that had been obtained through the grand jury's subpoena powers. Pimental argued that IFB agents such as Faragi were not "government personnel" within the meaning of Rule 6(e)(3)(A)(ii), and thus the exception to grand jury secrecy was not applicable and the earlier district court order was wrong.

In response, the trial court held that IFB investigators can not be "government personnel" within the meaning of Rule 6(e), and thus that the earlier ruling allowing the prosecutor to disclose grand jury materials to IFB investigators was in error. Pimental, 199 F.R.D. at 33-37 (D. Mass. 2001); Pimental, 201 F.R.D. at 25-26. It did not hold that because the disclosure had been authorized by the court, there could be no dismissal of the indictment. Rather, the district court refused to dismiss Pimental's indictment because the "error" did not substantially affect the grand jury's decision to indict, and thus it was harmless. Pimental, 204 F.R.D. at 227-28.

Pimental now challenges this pre-trial denial of his motion to dismiss the indictment. He also asks this court to consider his post-trial renewal of that motion, which the district court found to be moot due to its grant of Pimental's Rule 29 motion.

We conclude that the first district court's implicit conclusion that IFB agents are "government personnel -- including those of a state or state subdivision" within the meaning of Rule 6(e)(3)(A)(ii) was, on these facts, not error. We do not hold that all IFB employees, regardless of the circumstances, are government personnel, but only that here that decision was correct. We thus affirm on alternate grounds the denial of Pimental's motion to dismiss the indictment, which disposes of his post-trial renewal of the motion.[8] See Bonano v. E. Caribbean Airline Corp., 365 F.3d 81, 86 (1st Cir. 2004) ("We are not confined to the lower court's rationale, but may affirm a judgment on any independent ground made manifest by the record.").

(A) Grand Jury Secrecy and the Limited Exception for Government Personnel.

Federal grand juries are responsible for investigating criminal allegations while simultaneously shielding innocent citizens from unfounded accusations of criminal conduct. See

_____

[8]The government assumed arguendo for purposes of this appeal that Rule 6(e) was violated. We think it better to address the issue directly.

Branzburg v. Hayes, 408 U.S. 665, 686-87 & n.23 (1972). These sometimes competing roles "underlie[] the 'long-established policy that maintains the secrecy of the grand jury proceedings in the federal courts.'" United States v. Sells Eng'g, Inc., 463 U.S. 418, 424 (1983) (quoting United States v. Procter & Gamble Co., 356 U.S. 677, 681 (1958)). Grand jury secrecy facilitates the investigation of criminal charges by assuring potential witnesses that their testimony will not become public knowledge, thus encouraging them to testify freely and limiting the potential that they will be improperly influenced by those under investigation. See id. At the same time, it ensures "that persons who are accused but exonerated by the grand jury will not be held up to public ridicule." Id. (quoting Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 219 (1979)).

The specific dimensions of the grand jury secrecy requirements are codified in Fed. R. Crim. P. 6(e). That Rule prohibits certain people -- including grand jurors, interpreters, and, of particular relevance here, "attorney[s] for the government" -- from disclosing "a matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(b). Rule 6(e) also contains certain exceptions to the general secrecy requirement. The first pertinent exception at issue in this case, under subpart (3)(A)(ii), allows "[d]isclosure of a grand-jury matter" to "any government personnel -- including those of a state or state subdivision or of an Indian

tribe -- that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law." Fed. R. Crim. P. 6(e)(3)(A)(ii). The second, under 6(e)(3)(E), empowers a district court to authorize disclosure in certain situations. We think it implicit that a district court may also act in a motion to authorize disclosure under subpart 3(A).

(B) The IFB and the "Plain Meaning" of "Government Personnel."

The IFB is a "quasi-governmental entity," In re Justices of the Superior Court, 218 F.3d 11, 13 (1st Cir. 2000), that investigates allegations of fraudulent insurance transactions. Commonwealth v. Ellis, 429 Mass. 362, 365 (1999). Its creation was authorized by Massachusetts statute, St. 1996, c. 427, § 13,[9] and carried out by two voluntary associations of Massachusetts insurance carriers, the MWCRIB and the Automobile Insurance Bureau (AIB), which are themselves licensed under Massachusetts law. See id. at 13; Mass. Gen. Laws ch. 175A § 8 (licensing AIB); Mass. Gen. Laws ch. 152 § 52C (licensing MWCRIB). See generally Ellis, 429 Mass. at 365. The authorizing statute requires that the MWCRIB and AIB each fund half of the IFB's budget, § 13(c), and each provide the IFB with five of its fifteen Board members, § 13(a). The remaining five IFB Board members are Massachusetts public

_____

[9]This Act is codified in the notes to Mass. Gen. L. ch. 266, § 111B, rather than in the section itself. This confusing choice of codification has resulted in the incorrect referencing of the Act as codified as "Mass. Gen. Laws ch. 427, § 11." See, e.g., In re Justices, 218 F.3d at 13.

officials. § 13(a). Under the statutory scheme, every insurer "having reason to believe that an insurance transaction is fraudulent" must advise the IFB of its suspicions. § 13(e). The IFB, in turn, is required to review those cases and investigate further when necessary. § 13(f). Where the IFB's executive director "is satisfied that a material fraud, deceit, or intentional misrepresentation has been committed in an insurance transaction," he must "refer the matter to the attorney general, the appropriate district attorney <u>or the United States attorney</u>." § 13(h) (emphasis added).

The trial court rejected the motion court's implicit holding, concluding that IFB employees can not be "government personnel," based primarily on a "plain meaning" reading of the term. Emphasizing that the IFB's funding comes entirely from two private associations of insurance companies and that the majority of its Board are not public officials, the court concluded that "the IFB inhabits a region of the private/public spectrum that is much closer to a purely private agency." <u>See</u> <u>Pimental</u>, 199 F.R.D. at 33.

As an initial matter, there may well be instances in which an entity (or at least some of its employees) is considered governmental for a particular purpose despite the fact that it is both controlled and financed by private individuals. Even assuming that the IFB is completely controlled and financed by

private insurance companies, that does not necessarily mean that its employees cannot be government personnel for purposes of Rule 6(e).

Here, the district court's characterization of the IFB as entirely funded and controlled by private entities was incorrect. While it is true that the IFB's funding comes entirely from MWCRIB and AIB, two private associations of insurance companies, both of those associations are required by Massachusetts law to provide that funding. See st. 1996, c. 427, § 13(c); see also Ellis, 429 Mass. at 373 n. 16. This is not an instance in which private entities have voluntarily chosen to spend their resources on investigative personnel. Cf. United States v. Tager, 638 F.2d 167, 168 (10th Cir. 1980) (where insurance companies voluntarily chose to fund an entity to investigate insurance fraud and completely controlled the scope of its actions, employees of the entity were not "government personnel" within the meaning of Rule 6(e)(3)(A)(ii)).[10] If anything, the IFB's funding is more akin to

---

[10]In Tager, the government disclosed grand jury material to Mr. House, an employee of the Insurance Crime Prevention Institute (ICPI), an organization funded by insurance companies for the purpose of investigating possible frauds against them. 638 F.2d at 168. Unlike in this case, though, there was no doubt that "[n]either the ICPI nor Mr. House was in any official position whatsoever." Id. The opinion does not indicate that any statute existed that established or authorized the ICPI, provided for its funding or structure, or gave it special responsibilities or privileges. See id. The court briefly noted that Rule 6(e)(3)(A)(ii) did not apply because Mr. House was not "government personnel," and spent the bulk of the opinion considering an entirely separate exception to grand jury secrecy that is not at

-37-

a state-mandated tax on insurance companies than a voluntary expenditure by private entities. Cf. Keller v. State Bar of Cal., 496 U.S. 1, 9-11 (the mandatory charging of dues by the California Bar Association was state action that implicated First Amendment concerns). Indeed, the Supreme Judicial Court, the final arbiter on Massachusetts law, has explicitly found that "insurance companies [cannot] control the [IFB] by withdrawing financial support" even were they to attempt to forego the benefits of membership in the MWCRIB and AIB. If insurers withdrew from these organizations, "the Legislature could easily amend the statute to base assessments on premiums written or on some other standard." Ellis, 429 Mass. at 373.

The trial court's analysis also underestimates the full extent of the control that the Commonwealth exercises over the IFB. Although only a third of the IFB's board members are public officials, the IFB's purpose, organizational scheme, and basic operations are all dictated by statute. And while the IFB's day-to-day administration within the framework is, in large part, controlled by individuals who are not public officials, it is also subject to the constant oversight of the Massachusetts legislature, to which the IFB must submit a report every six months. § 13(j).

In addition, the IFB was conceived of and authorized by statute as part of a larger scheme to curb insurance fraud, a

issue here. See id. at 168-69.

matter of significant public concern, both at the state level, <u>see</u> <u>Ellis</u>, 429 Mass. at 365, and nationally, <u>see</u> <u>United States</u> v. <u>Hurn</u>, 368 F.3d 1359 (11th Cir. 2004) (affirming federal conviction for workers' compensation fraud); <u>United States</u> v. <u>Fore</u>, 169 F.3d 104 (2d Cir. 1999) (same). The IFB was also given significant powers to achieve this goal, including access to various state records that are not normally available to private entities and the right to review all suspicions of fraud within the insurance companies. <u>See</u> st. 1996, c. 427, §§ 13(d) & (e). It also has the affirmative obligation to report suspicions of fraud when they are sufficiently corroborated. § 13(h). Massachusetts chose to specify that those suspicions may be reported to federal prosecutors.

The IFB straddles the line between a government and a private entity, having attributes of each. As such, the text of the Rule 6(e)(3)(A)(ii) itself provides little guidance on whether IFB employees can be characterized as "government personnel" within the meaning of the Rule. Neither this Court nor any other federal circuit court[11] has previously addressed whether IFB employees, or similar quasi-state-government employees, fall within the term "government personnel" in Rule 6(e)(3)(A)(ii).[12] Given the lack of

---

[11]Several district court decisions have addressed the issue. <u>See, e.g.</u>, <u>In re Grand Jury Proceedings</u>, 158 F. Supp. 2d 96 (D. Mass. 2001).

[12]The district court saw things differently, saying that <u>Tager</u>, 638 F.2d 167, involved a "finding [that] the government violated Rule 6(e)(3)(A)(ii) under circumstances materially

either a clear textual resolution or of controlling authority, we turn to the history of the Rule and its purpose in allowing disclosure only to "government personnel" but not others.

(C) <u>History and Purpose of the Exception to Grand Jury Secrecy in Rule 6(e)(3)(A)(ii).</u>

Before 1977, Rule 6(e) did not permit the disclosure of grand jury materials to government employees who were not attorneys. <u>Sells Eng'g</u>, 463 U.S. at 436. Over time, the lack of such a provision became "something of a problem in practice, because Justice Department attorneys found that they often needed active assistance from outside personnel -- not only investigators from the FBI, IRS, and other law enforcement agencies, but also accountants, handwriting experts, and other persons with special skills." <u>Id.</u> In response to this concern, the Advisory Committee on Rules suggested amending Rule 6(e) to allow disclosure to non-attorney government personnel. <u>See</u> <u>id.</u> at 436-37. Although Congress heatedly debated the proposed amendment and initially voted to disapprove it, concern focused principally on the prospect that grand jury materials would be used to pursue civil, rather than criminal, matters. <u>See</u> <u>id.</u> at 437. The principle of grand jury secrecy would be severely compromised, the objection went, if government agencies such as the IRS could indirectly use materials

indistinguishable from those here." <u>Pimental</u>, 199 F.R.D. at 35. <u>Tager</u> has very little to do with this case, where there is no immediately obvious answer to the question of whether the person to whom the disclosure was made was government personnel.

collected by the grand jury to help prosecute a civil case against an accused.  See id.  Most law-makers, it appears, agreed with the basic principle that grand jury materials "should be available to 'every legitimate member of [the] team' conducting the criminal investigation."  Id. at 439 (quoting the testimony of Acting Deputy Attorney General Richard Thornburgh, testifying before the House on behalf of the Justice Department).

Precisely who was a "legitimate member" of the prosecution team was also a subject of some discussion:

> [Rep. James Mann:] Along the same line, the rule seems to restrict to other Government personnel the experts -- and I will use that term loosely -- that the attorney for the Government may call upon.  We have a pretty big Government with a lot of experts, but on certain matters there may not be a governmental employee who is expert in that field.  Is it your intention not to permit the prosecutor to call in an astrologer or astronomer, for example?
>
> Professor LaFave [Reporter, Advisory Committee on Criminal Rules]: Yes; that is correct.  Apparently representatives of the Justice department whom we talked to about this particular problem did not seem to think that was a problem, in other words, that there was an occasion when they would need an expert and couldn't find the astrologer some place in the Federal Government.

Proposed Amendments to the Federal Rules of Criminal Procedure: Hearing Before the House Subcomm. on Criminal Justice of the House Comm. on the Judiciary, 95th Cong. 92 (Feb. 24, 1977).  The Rule's limitation of disclosure to "government personnel" thus reflected the basic belief that any needed expertise on a particular criminal

matter could be found within the confines of the federal government.

As it turned out, federal prosecutors could not always find the necessary expertise within the federal government to prosecute a case. In some instances, federal prosecutors temporarily hired outside experts to assist in the prosecution of a case. Recognizing the import of sharing grand jury materials with such temporary employees, two circuit courts held that such temporary employees were indeed "government personnel" within the meaning of the Rule 6(e)(3)(A)(ii). United States v. Anderson, 778 F.2d 602, 605 (10th Cir. 1985) (an expert witness on trust law); United States v. Lartey, 716 F.2d 955, 963-64 (2d Cir. 1983) (a retired I.R.S. agent). Federal prosecutors also occasionally sought the assistance of state and local employees, attempting to share secret grand jury materials with them. The district courts' responses to such efforts were more mixed. Compare In re Grand Jury Proceedings, 445 F. Supp. 349, 350 (D.R.I. 1978) (state and local personnel are not within the exception for government personnel in the Rule); with In re 1979 Grand Jury Proceedings, 479 F. Supp. 93, 95-96 (E.D.N.Y. 1979) (state and local personnel included).

Partially in response, Rule 6(e)(3)(A)(ii) was amended in 1985 to include expressly personnel "of a state or state subdivision" within the term "government personnel." See Fed. R.

Crim. P. Rule 6, advisory committee's notes on 1985 amendments. "It is clearly desirable," the Committee wrote, "that federal and state authorities cooperate, as they often do" in complex cases such as "major fraud cases" and that federal prosecutors have access to "the assistance of state law enforcement personnel, which could be uniquely beneficial." Id. Although increased disclosure was obviously in tension with the general rule of grand jury secrecy, the Committee "emphasized that the disclosure permitted is limited": it is permissible only "in connection with the attorney for the government's 'duty to enforce criminal law' and only to those personnel 'deemed necessary . . . to assist' in the performance of that duty." Id.

Two important themes, for our purposes, can be discerned from this legislative history. First, a key purpose of Rule 6(e)(3)(A)(ii) is to facilitate cooperation between federal prosecutors and state personnel, who often are uniquely situated to assist in the investigation and prosecution of federal criminal cases. When court decisions tended to limit the potential for such cooperation because of concerns that state officials, who are not under the control of the federal government, could not be entrusted with grand jury materials, they were explicitly overruled by Congress. Thus, Congress made a conscious decision to entrust certain state, as well as federal, personnel with information concerning matters before a grand jury under certain conditions.

-43-

Second, a primary safeguard for protecting the countervailing interest in the secrecy of grand jury proceedings is the requirement that such disclosure must be necessary for the enforcement of criminal law. Although the Rule's limitation to "government personnel" also helps to assure the secrecy of grand jury proceedings, that limit was not contemplated by either Congress in 1977 or the Advisory Committee in 1985 as the primary mechanism for doing so.

These themes convince us that the exception in Rule 6(e)(3)(A)(ii) may cover the unique quasi-governmental investigators of the IFB, depending on the facts of the situation.

In many instances of insurance fraud in Massachusetts, IFB investigators, rather than members of a more classic state law enforcement agency, will be the individuals who will have the most in-depth knowledge of that fraud. This is a direct result of the way in which Massachusetts has chosen to structure its investigations into such matters. Congress clearly desired that Rule 6(e)(3)(A)(ii) would allow federal prosecutors to take advantage of the state's investigative processes when such cooperation was necessary to prosecute federal crimes such as mail fraud.

Additionally, by specifically including state personnel in Rule 6(e)(3)(A)(ii), Congress chose to trust state officials that the state itself had entrusted with the investigation of

criminal matters. Here, Massachusetts has given the hybrid private/public IFB significant powers and responsibilities. In the course of their initial investigations, IFB investigators have access to non-public information that is not normally available to private investigators. § 13(d). If that investigation leads the IFB executive director to refer the case to the Attorney General's Office, the IFB investigator initially assigned to the case provides significant support to the prosecuting attorney. See Commonwealth v. Harwood, 432 Mass. 290, 299 (2000) ("[I]t has been customary for principal investigators from the IFB to provide ongoing investigatory support for the Attorney General's subsequent inquiries."). Moreover, in state criminal prosecutions the state considers IFB agents to be assistants to prosecutors: "for the purposes of preserving potentially exculpatory evidence," the IFB is "under the general supervisory umbrella of the office of the prosecutor." Id. at 300. Consequently, exculpatory evidence that IFB investigators lose can be attributed to the prosecution. Id.

We do not know the many factual variations that could be presented by use of IFB personnel on federal criminal investigative teams; we do not hold that all IFB personnel are qualified as a matter of status. Because the interest in the secrecy of grand jury proceedings is intense, this is not an area for categorical approvals tied to labels. The mere fact that a person works for

the IFB does not mean that he or she fits the definition for government personnel within Rule 6(e)(3)(A)(ii).

For this reason, we do not consider that the prosecution has self-executing powers under Rule 6(e)(3)(A)(ii) simply to designate IFB personnel as recipients of grand jury material. Rather, the prosecutor must seek court authorization where quasi-governmental agencies such as the IFB are involved and make a functional showing that the individual involved is within the Rule. In the past, the Office of the U.S. Attorney for Massachusetts has chosen to seek court authorization first, on a case-by-case basis whenever it wishes IFB personnel to be involved. It should continue to do so.

## V.

The district court's grant of the Rule 29 motion is **reversed**. The denial of the motion to dismiss the indictment is **affirmed** and the renewal of that motion is **denied**. The case is remanded to the district court for sentencing.